McKinney, J.,
delivered tbe opinion of tbe Court.
This was an action of trespass brought in tbe Circuit Court of Hardeman by Mrs. James, for an assault and battery committed by tbe defendant on a slave named Bill, tbe property of tbe plaintiff.
Judgment was rendered for tbe defendant in tbe Court below, and tbe case is brought here on an appeal in error prosecuted by tbe plaintiff.
It appears from tbe bill of exceptions that one Champ, tbe keeper of a public - bouse in tbe town of Bolivar, hired tbe slave Bill from tbe plaintiff for a few days during tbe June term of tbe Circuit Court, to assist as a *399 servant in tbe bouse, at seventy-five cents per day. Tbe defendant Carper -was a guest, and on retiring to bed placed bis pocket - book, containing about one hundred and twenty dollars, under tbe bead of bis bed, and in tbe morning forgot to remove it. On missing tbe pocketbook from his pocket, tbe defendant mentioned tbe matter to Champ. Tbe latter immediately inquired of tbe slave Bill — who made up tbe bed that morning — for tbe pocket - book; tbe slave replied that be put it back where be found it, under tbe bead of tbe bed. Champ went up to tbe room and found tbe pocket-book under the head of tbe bed, as tbe slave bad stated, but there was no money in it. Without further inquiry, Champ immediately ordered tbe slave to go to tbe stable, and proceeded there himself, in company with tbe defendant and one Simpson. Champ stripped tbe slave,- “and,” in tbe language of tbe bill of exceptions, “bucked him over a wheelbarrowtook out bis knife, and threatened to castrate tbe slave if be did not give up tbe money, tbe slave earnestly declaring bis innocence of tbe charge. Champ then took a martingale and inflicted some twelve or fifteen blows on tbe slave, when be was called to tbe bouse. On leaving to go to tbe bouse, be told Carper, tbe defendant, to “ whip tbe God damned negro’s guts out, unless be gave up tbe money.” Tbe defendant then tied him up to a stall, and continued to beat him with tbe martingale, tbe slave all tbe time protesting bis innocence. Champ then took tbe slave and returned him to tbe plaintiff.
Tbe physician who was called in to see tbe slave • proves that bis shoulders and back were bruised and wounded, that tbe skin was broken in several places, *400 and that some of the injuries had the appearance of having been done with the ring of a martingale, and his shirt was stained with blood; that the slave complained of his kidneys being affected, and also of an injury to his head.
The proof clearly shows that the slave was entirely innocent, and that, immediately after the beating inflicted on him, it was ascertained that a vagrant white man about the house had committed the theft; who was arrested, surrendered the money, except some inconsiderable amount, and at the same term of the Court was convicted of the offence, and sent to the penitentiary.
The Court, amongst other things not necessary to be here noticed, instructed the jury, “that the owner of a slave had the right to inflict chastisement on him, and that the law had made no provision to determine whether it was right or wrong, nor held the owner amenable for inflicting chastisement on his slave, except that the master had not the right to take away life or limb, or inflict great or unnecessary torture; . . . that any one to whom a slave was hired for a definite period would for that time be substituted to the rights of the owner, and have the same right to punish or chastise the slave that the master would; . . . that if the chastisement inflicted on the slave was by the special direction of Champ, and no other or greater chastisement was inflicted by the defendant than Champ directed, then the jury should find for the defendant.”
It would be out of place here to enter upon a discussion of the delicate and difficult question as to the extent of the owner’s right to inflict punishment on his slave, as no such question properly arises on this record. *401 It may not Tbe improper to remark, however, that the principle assumed in the charge has never yet been announced by the sanction of this Court. In the latest case in which this subject is discussed — Nelson vs. The State, 10 Humph., 518, 524, 527 — Judge Green, in delivering the unanimous judgment of the Courjfc, shows that the principle stated in the case of Jacob vs. The State, 3 Humph., 493 — upon which probably the charge of the Court in the present case is based — was perhaps only the opinion of the Judge who delivered the judgment, and its correctness is impugned. But, as observed, we decline entering upon this question at present.
Whatever the right of the owner of a slave in this respect may be admitted to be, we wholly dissent from the conclusion of the Circuit Judge, that upon a contract of hiring, whether for a definite or indefinite period, this right of the owner is, by mere implication of law, delegated to the hirer of the slave. A more startling proposition to the slave-owner can scarcely be conceived. It is sanctioned neither by reason, policy, nor sound authority. To this, as to the various other domestic relations, belongs certain peculiar rights, resulting from and incident to the particular relation, and which, from their very nature, are not to be absolutely transferred. In the relation of parent and child, the parent has a right to exercise such discipline in the domestic forum as may be requisite for the discharge of the duties imposed on him as parent. This is the true foundation of parental power. 2 Kent’s Com., 203. But he may not exceed the bounds of moderation. Reeves’ Domestic Relations, 288. This is a power, however, of which no one else can claim to be possessed, in virtue of a right to the services of the *402 child for a time, under a contract of hiring from the parent. The right is inherent in the relation of parent and child, and the parent cannot he presumed ■ to have intended to transfer such right, in an unqualified sense, to the hirer — if indeed it were admitted to he transferable. The same remarks might he made in respect to the relation of master and apprentice, and other domestic relations. And the reasoning, to some extent at least, applies to the relation of master and slave. By the contract of hiring, the hirer becomes entitled to the ser* vices of the slave in the business or occupation contemplated by the contract; and of necessity he becomes, in a qualified sense and to a limited extent, invested with authority to exercise at least some of the rights and powers which properly belong only to the owner. Having the right for a time to control the person and services of the slave, the hirer must of necessity be regarded as possessing the right to inflict reasonable corporal punishment on the slave, for insubordination, disobedience of lawful commands, wanton misconduct, or insolent behavior. The difficulty of defining with exact precision the limits of this qualified right in the hirer to chastise the slave of another in his employ, is very sensibly felt; and at last each particular case must be left in some measure to depend upon its own peculiar circumstances — subject to this qualification, however, that the hirer must always, at his peril, be able to show that there existed reasonable ground for the chastisement, and that it did not, either •in the extent or manner of it, exceed the bounds of ■moderate correction, in view of all the circumstances of the case, and the relations recognized by our law as jxisting between the black and white races.
*403 Rut as respects criminal offences committed by a slave during the period of hiring — disconnected with any misconduct on the part of the slave towards the person of the hirer, or of others whom it is his duty to protect — there is no difficulty. Our law has provided for the punishment of all ' offences committed by slaves. And though it were conceded, for the -sake of the argument, that the owner of the slave, in virtue of his absolute right of property, might take the law into his own hands, and avenge the crime committed by the slave without appeal to the law, it is very clear that this may not be done by the hirer of the slave, or by a stranger. Such a right, supposing it to be possessed by the' master, cannot be transferred by him to another; for that would be to permit private individuals to usurp the province and authority of the ministers and tribunals of justice. Rut even if such a delegation of power to punish for crimes committed by a slave could be made by the owner to the hirer, it certainly could not be presumed to have been made from the mere contract of hiring. The contract implies no such thing, nor does the law raise any such presumption; and the last thing that the owner of a slave would consent to do, even if he had the power, would be to make such a delegation of power to a hirer. One of the great dangers to the owners of slaves is the recklessness and wanton disregard, on the part of hirers, of the safety of the slave and the interests of the owners. The interests of the owner, sound policy, and humanity alike forbid that the hirer of a slave should be clothed with any such power; and if the hirer is possessed of no such authority, of course he can communicate none to a third person.
*404 If a slave commits a criminal offence while in the service of the hirer, it would he sufficient cause to discharge him. And if the hirer desires to have him punished for such offence, the law has pointed out the mode, and he has the right to pursue it, hut he has no right to become himself the avenger of the violated law, much less to depute another person in his stead. And for a battery committed on the slave under such circumstances, the owner may well maintain an action against the wrongdoer, in which the jury would be justified in giving exemplary damages in a proper case.
It is said in some of the cases that the hirer, for the time being, is substituted in the place and invested with the rights of the owner of the slave. But this general proposition is incorrect. By the contract of hiring, the master parts with none of his rights as owner, except his right to the possession and services of the slave for the time limited in the contract. The qualified right of the hirer to control the slave, and to administer moderate correction, under the limitations before stated, exists in the hirer not properly by transfer or delegation from the owner, but rather is implied by law in favor of the hirer, as essential to the relation in which he stands to •the slave as hirer.
It is the duty of the owner to protect the person of his slave, and, in a lawful mode, to seek redress for injuries done to him. To deny the owner’s right, in a case like the present, to maintain an action, would be not only to ignore the plainest principles of reason and of right, but it would be justly esteemed a reproach to humanity in any condition of civil society above the level of barbarism.
*405 We are .aware that in at least one of the slave States — perhaps in more — contrary principles have been declared, bnt we forbear to notice the cases: we utterly dissent from the doctrine they maintain, as untenable upon any just principles.
We hold, therefore, that the instruction to the jury was erroneous, and that the action was well brought and is maintainable.
The judgment will be reversed, and the case remanded for a new trial upon the principles herein announced.